# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| MISNY & ASSOCIATES CO., L.P.A. | ) | CASE NO. 1:15-CV-00681-DCN |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | **PLAINTIFF'S TRIAL BRIEF** |
| | ) | |
| AYLSTOCK, WITKIN, KREIS & | ) | |
| OVERHOLTZ, PLLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, pursuant to this Court's Civil Jury Trial Order (Docket No. 63) entered August 23, 2016, submits its Trial Brief.

### A. Statement of Facts

This Court has set forth the relevant facts in its Order on the Fed. R. 56 motions and in Plaintiff's Brief in Opposition to Defendant's Summary Judgement Motion, in large measure repeated below.

Plaintiff, Misny & Associates Co., L.P.A. ("Misny"), brings this contract breach claim against Defendant Aylstock, Witkin, Kreis & Overholtz, PLLC, ("Aylstock Firm") to recover unpaid co-counsel fees. Misny was counsel to hundreds of personal injury claimants in certain mass tort cases concerning unsafe pharmaceutical drugs and defective medical devices. After significant negotiations, Misny agreed to refer all its mass tort clients to the Aylstock Firm under a case referral agreement – Mass Tort Referral Fee Agreement ("Contract"). Defendant has failed to pay the full co-counsel fees under the Contract. The damages are nearly $1.3 million.

The Aylstock Firm and Misny met in August of 2007 to discuss potential marketing and advertising strategies to obtain clients for the mass tort cases. The clients were future claimants

injured from the use of certain medical drugs and/or medical equipment including Avandia, Prempro ("HRT or Hormone Replacement Therapy cases"), Digitek, Medtronic, Chantix, Fleet (OSP), Fosamax, Heparin, Hydroxycut, Levaquin, Remicade, Zicam and Trasylol (collectively, "Mass Tort cases").  During the initial discussions between Misny and the Aylstock Firm, it was determined that Misny would put together an advertising campaign in Minnesota to obtain HRT cases and in West Virginia and Pennsylvania to become "the mass tort king." Directing those efforts, the Aylstock Firm provided Misny a script and instructions on how to locate potential plaintiffs for certain pharmaceutical malpractice cases, where the victims of the defective products were in danger of losing their rights under various state law statutes of limitations

Misny immediately "jumped in with both feet. We started advertising. My recollection is that the Minnesota market was a good place to go and I was just astounded at the response we got. Our phones lit up, and it really took off." (Misny Dep. 92:23-93:3).  The advertising started immediately after the initial meeting with the Aylstock Firm. (*Id*., 93:12).  Misny began advertising in Minnesota for the HRT cases upon the advice and statements from the Aylstock Firm. *Id*., 93:16-94:5. The Aylstock Firm "felt that [Misny's] campaign would do well there." *Id.*

Misny's advertising commenced over one year prior to the parties' execution of the Contract. Misny advertised for mass tort cases, including the hormone replacement therapy (HRT) cases and cases for other pharmaceutical drugs and medical devices (e.g., Avandia, Traysol, Levaquin, Medtronic and Digitek). (*Id.,* 46: 17-20).  Misny relied on the direction of the Aylstock Firm to determine both "what drug was the appropriate target" and the location and timing of the advertising. (*Id.,* 42:5-14)  The advertising started in Minnesota, but eventually reached throughout the United States, including Ohio, Washington DC, Michigan, Mississippi, Alabama, Wisconsin, Maryland, Missouri, Illinois, Pennsylvania, Georgia, Arkansas, Tennessee,

New York and New Mexico. See Ex. 3, Plaintiff's Response to Defendant's Second Set of Interrogatories, Int. No. 16).

Misny spent approximately $2.78 million for advertising for mass tort matters. (Misny Dep. 115:7-25). Plaintiff hired a staff of individuals to screen calls, often working day and night to try to ascertain which potential clients had viable claims and may be successful in federal district litigation. (*Id*., 93:1-3).

From the time of the initial discussions through October 2008, Misny and the Aylstock Firm were discussing and negotiating the terms of the Misny Firm's joint representation of clients and co-counsel fees for the Mass Tort cases. See Ex. 4, 06/24/15 Declaration of Timothy P. Misny, Esq. ("Misny Dec."), ¶6. These discussions and negotiations included a tiered fee arrangement for Misny, whereby its portion of the gross attorney fees earned from the Mass Tort cases would decrease the longer the subject litigation remained pending. *Id*. During these discussions and negotiations in order to get the Misny to enter into an agreement, the Aylstock Firm repeatedly represented that they would pursue diligently the Mass Tort cases and use their best efforts to litigate, resolve and/or try the cases expeditiously. *Id*., ¶7. The diligence in pursuing the cases was important to Misny because the longer the cases remained pending, under any tiered-fee arrangement, Misny's share of the fee would be reduced.

Relying specifically on these and other representations by the Aylstock Firm, Misny continued the advertising and public awareness campaign to inform potential Mass Tort claimants of their legal rights and potential remedies for injuries suffered from the use of certain drugs and medical devices. *Id*., ¶8. Because the Aylstock Firm repeatedly promised and represented that it would diligently pursue the Mass Tort cases, Misny entered into the Mass Tort

3

Referral Fee Agreement ("Contract") with the Aylstock Firm in October 2008. *Id*.; See Contract, Ex. 5.

Misny conducted the initial consultation with each Mass Tort claimant, evaluated the specific facts, determined whether the claimant had a prima facie case and referred the claimant to the Aylstock Firm. (Misny Dep. 94:21-97:20). For the identification, evaluation, referral and servicing of the Mass Tort claimants, under the Contract, Misny was entitled to a share of the attorney fees largely rooted at its minimum on the length of time the case remained pending. Specifically, the Contract provided that:

> Misny and AWKO shall share fees, if any, generated from the representation of the mass tort claimants **according to the equities** and their relative contributions to the prosecution of the mass tort clients' cases. **It shall be assumed, subject to discussion between the parties of all applicable facts and circumstances….that….after one year of representation by AWKO…the parties agree to adjust the fee division based [on] their relative contributions to the representation of the mass tort claimant case and the equities**. Specifically, but without limiting the facts and circumstances to be considered, the parties will consider the financial costs that each [of] them have incurred related to the project, the attorney and staff resources that have been devoted to the project, the opportunity cost incurred as a result of handling the project, the resources necessary to achieve success on the project and the time required to complete the project.
>
> ***
>
> Notwithstanding the foregoing, Misny shall not receive less of the fees [as] indicated in the schedule below, and the exact amount shall, again, be determined based upon the parties relative contribution to the prosecution of the mass tort claimants case and the equities associated with the project:
>
>> a. For any mass tort claimant case which is settled within one year of AWKO's acceptance thereof, Misny shall receive no less than 50% of the fees generated therefrom;
>>
>> b. For any mass tort claimant case that settled more than one year but less than two years after AWKO's acceptance thereof, Misny shall receive no less than 40% of the fees generated therefrom;

>c. For any mass tort claimant case that settles more than two years but less than three years after AWKO's acceptance thereof, Misny shall receive no less than 35% of the fees generated therefrom; and

>d. For any mass tort claimant case that settles more than three years after AWKO's acceptance thereof, Misny shall receive no less than 35% of the fees generated therefrom absent exceptional circumstances and the agreement of the parties.

See Ex. 5, Agreement, Section 6.

However, in derogation of its specific representations and promises, the Aylstock Firm delayed over a year in pursuing the Mass Tort cases. (Ex. 1, Misny Dep. 9:9-16). In March 2010 Misny became aware that the Aylstock Firm delayed in ordering medical records, which caused additional delays in the prosecution and ultimate resolution of the Mass Tort cases (*Id*., 150:10-13; 21-25; 177:4-13). Misny worked to remedy this issue on the medical records and, in November 2010, raised the issue with the Aylsock Firm. *Id*. However, this delay caused the attorneys' fees to the Misny to decline per the terms of the Contract.

In August 2011, Plaintiff, consistent with the terms of the Agreement, contacted the Aylstock Firm to determine the exact amount of the Misny Firm's fee. (*Id*., 132:23-133:17). In pertinent part, the Agreement provides that "the exact amount shall, again, be determined based upon the parties relative contribution. . . and the equities . . ." (Ex. 5, Contract, Section 6). After significant negotiation, including multiple offers and counter-offers, the Aylstock Firm agreed to pay to the Misny Firm a flat fee of 42.5% for all Mass Tort cases regardless of the length of time needed to resolve the cases. (*Id*.,131-132:16-3; 133:7-17).

This determination was confirmed in the Aylstock Firm's performance. Beginning in November 2011 through the present, Misny began to receive 42.5% of the gross attorney fees on the Mass Tort cases, with one exception, the HRT cases, on which it received only 35%. (*Id*,. 139:9-17) The Misny Firm first became aware of this fact in November 2013 when the first

5

attorneys' fees disbursements on the HRT cases were made by the Aylstock Firm. The Aylstock Firm had decided in its sole, unfettered, untethered and arbitrary discretion either to withhold or take the 7.5% of the gross attorneys' fees, amounting nearly to $1.3 million, that is rightfully due and owing to Misny.

### B. Controlling Law

In pertinent part, paragraph 6 of the Mass Tort Referral Fee Agreement provides "the exact amount [of Misny's co-counsel fee] shall, again, be determined based upon the parties' relative contribution to the prosecution of the mass tort claimants case and the equities associated with the project."

See Paragraph 6 of the Agreement. This Court, in denying Defendant's motion for summary judgment on the contract claim, precisely framed the issue for trial: "Plaintiff's breach of contract claim is based upon his contention that in accordance with Paragraph 6, the parties agreed the "exact amount" of Ms. Misny's fee was to be 42.5% of the gross attorney's fees of the mass tort cases. Whether the parties actually made this "joint agreement" is a question of fact for trial. The Contract specifically called for the parties to determine the exact amount of Misny's fee. To that end, the only question for trial is whether the parties did in fact make that determination per Paragraph 6 of the Contract. The one and only question for the trier of fact to determine is whether the parties determined that Misny would receive 42.5% of the gross attorney fee.

The evidence in this case will demonstrate that the parties were engaged in arm's-length negotiation to determine, consistent with Paragraph 6 of the Contract, the exact amount of the fee owed to Misny. Ultimately Misny proposed 42.5% and the Defendant agreed.

The existence of an agreement, that is each party's respective consent to the essential terms as the requirement for enforcing the contract. See *Schlaegel v. Howell*, 2015-Ohio-4296, paragraph 17 (Ohio Ct. App. 2015). The *Schlaegel* court in no uncertain terms stated how such assent can be accomplished:

> A requirement to enforcing a contract is "'[a] meeting of the minds as to the essential terms of the contract.'" *Minster Farmers Coop. Exchange Co. v. Meyer*, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. And as to the essential terms, the contract must be specific. *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir.2005) (saying that "an agreement lacking terms specific enough to be enforced falls short of the Ohio standard for a valid contract"). In Ohio case law, the "meeting of the minds" concept is used interchangeably with the concept of "mutual assent." *Advance Sign Group, LLC v. Optec Displays, Inc*., 722 F.3d 778, 784 (6th Cir.2013). Under either concept, the standard is objective. *Jamaica Ave., LLC v. S & R Playhouse Realty Co*., 540 F.3d 433, 440 (6th Cir.2008), citing *Nilavar*, 127 Ohio App.3d 1, 711 N.E.2d 726. Put in mutual-assent language, for a contract to be enforceable, there must be a manifestation of mutual assent—generally, offer and acceptance—to the contract's essential terms. *Nilavar* at 11. "'[W]hile mutual assent is usually manifested by offer and acceptance, in oral contracts, mutual assent may be manifested by other acts or failures to act.'" *KeyBank Natl. Assn. v. Mazer Corp.,* 188 Ohio App.3d 278, 2010-Ohio-1508, 935 N.E.2d 428, ¶ 33 (2d Dist.), quoting LaPoint v. Templeton, 6th Dist. Fulton No. F-07- 014, 2008-Ohio-1792, ¶ 25. """It is sufficient if the intent is disclosed by word, deed, act, or even silence.""" Id., quoting *LaPoint* at ¶ 25, quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, 86, 49 Ohio Law Abs. 129, 75 N.E.2d 608 (1st Dist.1947).

*Schlaegel,* *17

Under the myriad tests articulated *Schaegel*, there was a joint determination by the parties that Misny would receive 42.5% of the gross attorney fees from any settlement on the cases referred to the Aylstock Firm under the Mass Tort Referral Fee Agreement. This necessarily includes the HRT cases on which Defendant only paid Misny 35% of the gross attorneys.

C. **Witness List – See Exhibit A**

D. **Exhibit List – See Exhibit B**

### E. Evidentiary Issues

Plaintiff anticipates that Defendant may attempt to introduce evidence and/or argue before a trier of fact that the 42.5% determination was an oral modification of the agreement and, therefore barred by the express terms of the Mass Tort Referral Fee Agreement.  This would amount to a re-litigating of Defendant's legal contention on summary judgment, which this Court denied. Essentially, Defendant argues that Plaintiff's contract claim must be dismissed because the 42.5% joint determination was not reduced to writing and Section 9 of the Agreement provides that any modification of the agreement must be in writing.

Any prospective attempt to raise this issue, whether by argument or evidence, would be barred by this Court's ruling on summary judgment.  This Court specifically found that whether there was a 42.5% agreement is a matter for a trier of fact to decide. Moreover, on summary judgment, this Court found the contention, upon the plain language of the contract, without merit as a matter of law: "Paragraph 6 shows that the parties intended to discuss and potentially adjust the distribution of fees as the circumstances mentioned in Paragraph 6 developed."  The Contract calls for the parties to "determine" an "exact amount" to be paid to Misny and there is nothing in the Contract that requires that determination to be in writing.  There is but no doubt that the determination was made orally, not in writing.  However, in allowing this claim to be heard and decided by a trier of fact, this Court recognized that the determination of the exact amount, here claimed by Misny to be 42.5%, is not a modification of the Contract, but rather consistent with the terms of the Contract.

Accordingly, this Court should not permit the Defendant to put into evidence or, otherwise, or argue before the trier of fact that the 42.5% joint determination was a oral modification barred by the terms of the contract.

8

F.  **Proposed Voir Dire - NONE**

G.  **Proposed Jury Instructions – See Exhibit C**

                    Respectfully submitted,

                    /s/ Aparash Paul
                    Joel Levin         (0010671)
                    Aparesh Paul    (0077119)
                    Mark Mikhaiel   (0091656)
                    Levin & Associates Co., L.P.A.
                    1301 East 9th Street, Suite 1100
                    Cleveland, Ohio  44114
                    Tel:  (216) 928-0600
                    Fax: (216) 928-0016
                    jl@levinandassociates.com
                    ap@levinandassociates.com
                    mm@levinandsassociates.com

                    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

      The foregoing PLAINTIFF'S TRIAL BRIEF was filed electronically with the Court on this 25th day of January, 2017.  Notice of this filing will be sent by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                    /s/ Aparesh Paul
                    Aparesh Paul    (0077119)